**WO**

1
2
3
4
5
6
IN THE UNITED STATES DISTRICT COURT

7
FOR THE DISTRICT OF ARIZONA

8

| | |
|---|---|
| Garrett White, M.D., a North Carolina citizen, | No. CV08-0890-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| AKDHC, LLC, dba Arizona Kidney Disease & Hypertension Center, an Arizona limited liability company, | |
| Defendant. | |

Plaintiff Garrett White ("White") has asserted four claims against Defendant Arizona Kidney Disease & Hypertension Center, LLC ("AKDHC") arising from AKDHC's termination of White's employment. The claims include breach of contract, breach of the implied covenant of good faith and fair dealing, violation of 42 U.S.C. § 2000e-2, and violation of 42 U.S.C. § 1981. Now pending before the Court is Defendant AKDHC's Motion for Summary Judgment (doc. # 68) on all four claims.

## I.    Legal Standard for Summary Judgment

The Court should grant summary judgment if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce sufficient evidence to persuade the Court that there is no genuine issue of material fact. *Nissan Fire &*

*Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Conversely, to defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nature of this responsibility varies, however, depending on whether the moving party or the nonmoving party would bear the burden of proof at trial on the issues relevant to the summary judgment motion. If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production under Rule 56(c) by producing "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1105-06; *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

When the moving party has carried its burden under Rule 56(c), the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*

In the context of summary judgment, the court presumes the nonmoving party's evidence is true and draws all inferences from the evidence in the light most favorable to

the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the nonmoving party produces direct evidence of a genuine issue of fact, the court does not weigh such evidence against the moving party's conflicting evidence, but rather submits the issue to the trier of fact for resolution. *Id.*

## II.    Factual Background

Viewed in the light most favorable to White, the pertinent facts are as follows. In early September 2003, Garrett White, an African American nephrologist, interviewed in person at AKDHC for a position as a physician. His interviewers included Susan Price, CEO and shareholder of AKDHC, and several physician shareholders, including Dr. Ed Laurel, Dr. Isabel Guerra, Dr. Rick Mishler, Dr. Bob Moffitt, Dr. Yogesh Amin, Dr. Savas Petrides, Dr. Jim Ferraro, Dr. Ariv Swaminathan, and Dr. Paul Sandler. All of these named interviewers voted to hire White after the interview.

On September 12, 2003, White and AKDHC, through its CEO Susan Price, entered into an employment relationship when both White and Price signed an employment agreement ("Employment Agreement"). Provision 2 of the Employment Agreement states that the term of the agreement "shall continue until terminated as hereinafter provided." Provision 11, entitled "Termination," specifies that the agreement "may be terminated by either party hereto without cause upon ninety (90) days written notice to the other party" and that AKDHC "shall have the right at all time to discharge Employee for cause." No other provisions address the severability of the employment relationship between White and AKDHC. Provision 7 of the Employment Agreement states that AKDHC will maintain facilities and provide equipment, drugs, supplies, and personnel required by White to perform his duties during his employment. Finally, the Employment Agreement also includes an "Exclusive Service" provision, stating that employees "shall not, without the written consent of Company, directly or indirectly, render services of a professional nature to or for any person or firm for compensation . . . ." White also received a Physician Guide, which, among other things, reiterates the "Exclusive Service" provision and states that "[a]ll fees and compensation

- 3 -

received or realized as a result of the rendition of professional services by a physician shall belong to and be paid and delivered to the Company." AKDHC alleges that these provisions form the basis for the company's purported "common pot" policy, which requires all physicians to remit to AKDHC any payments they receive for giving lectures or seminars outside of AKDHC during working hours, which are from 7am to 5pm.

Over the next three years, on behalf of White, AKDHC wrote three letters ("Mortgage Letters") for the purpose of providing financial information to facilitate White's acquisition of a mortgage. The first, written sometime prior to January 2004, outlines White's five-year projected salary and benefit package and appears on its face to be signed by Susan Price. The second, dated February 13, 2006, and the third, dated February 16, 2006, were signed by AKDHC's Director of Finance and both briefly outline White's projected salary and bonus structure for the period beginning in 2006 and ending in 2009. Although the January 2004 letter refers to the salary and benefit package as increasing on a "guaranteed scale," none of the letters refers in any way to the term or severability of the employment relationship between White and AKDHC.

Also during White's employment with AKDHC, in a January 2006 resolution, AKDHC's board of directors eliminated a $42,000 buy-in requirement for incoming physician partners ("BOD Resolution"). In its place, the board adopted a new five-year salary and bonus scale that reflects the new five-year partnership track. According to the BOD Resolution, "there is a 'sweat equity' over the course of 5 years of a little over $1,000,000 to full partnership status." It does not expressly mention the severability of employment relationships between AKDHC and its physicians. This BOD Resolution applied to White, who was a non-shareholder physician at the time it was adopted.

From 2004 onward, White entered into at least two contracts with Ortho Biotech, a pharmaceutical company, pursuant to which White gave lectures sponsored by Ortho Biotech in exchange for fees. He received $2,500 in 2005 and $2,000 in 2006. While White had oral authorization from AKDHC to give the lectures, he did not have express

authorization to keep the payments received for giving the lectures. Nonetheless, White kept all payments received from Ortho Biotech.

On September 11, 2006, Price wrote a letter to White regarding various instances of his alleged inappropriate behavior and statements to other workers, and violations of AKDHC's "common pot" policy for failing to remit to AKDHC the payments he received from Ortho Biotech. In the letter, which was signed by Price in her official capacity as CEO of AKDHC, Price stated that "[t]he Governance Committee will conduct a peer review investigation, at which time you will have the opportunity to candidly discuss these specific situations in depth." White responded with a letter dated September 12, 2006, in which he "welcome[d] the opportunity to discuss the details regarding issues of [his] conduct at AKDHC to the Governance Committee." Neither the Employment Agreement nor the Physician Guide expressly guarantees to employees the right to a formal Governance Committee hearing prior to termination of employment.

On September 15, 2006, AKDHC held a shareholders' meeting to discuss White's alleged misconduct, including his failure to remit to the company "pot" all payments received from Ortho Biotech. At the meeting, all seventeen shareholders who were present voted to terminate White's employment. Of those who initially interviewed and voted to hire White, all but Dr. Paul Sandler, who was absent, voted to terminate him. The minutes of the meeting refer to the general concern that White's "intellectual dishonesty will always be in question."

AKDHC tendered a notice of termination to White on September 18, 2006, without holding a formal Governance Committee hearing and without giving White an opportunity to explain his alleged misconduct. The notice stated that the termination was without cause and would be effective December 17, 2006, ninety days from the date of the notice. The notice required White to return all office property, including keys and a phone, immediately, but assured him that AKDHC would continue to pay his full salary, benefits, and a bonus to him for ninety days, which AKDHC did. White was denied access to AKDHC's facilities, supplies, and patient records and files during the ninety-

day period.  Also on September 18, 2006, AKDHC's Executive Assistant, Susan Luz, sent a memorandum to other hospitals in the area at which White had staffing privileges. It stated that "[e]ffective this date, please note that Dr. Garrett White is no longer associated with Arizona Kidney Disease & Hypertension Center" and it provided a forwarding address and phone number for White.

White is the only physician employee ever to have been terminated by AKDHC. Other physicians at AKDHC have been reprimanded for communication and behavioral misconduct in the workplace, but none of them is African American and none has been terminated.  These physicians include Dr. Donald Schon, a physician shareholder; Dr. Paul Sandler, a physician shareholder; Dr. David Raskin, a physician shareholder; Dr. Georgetta Bidwell, a non-shareholder phyician; Dr. Isabel Guerra, a physician shareholder; and Dr. Nilesh Patel, a non-shareholder physician.  None of these physicians, nor any other physician at AKDHC, has kept payments and honoraria received for giving lectures outside the workplace.[1]

## III.  Analysis

### A.  Breach of Contract

#### 1.  The EPA applies to White's breach of contract claim.

The severability of employment relationships in Arizona is presently governed by the Employment Protection Act ("EPA"), codified at A.R.S. § 23-1501. *See generally Cronin v. Sheldon*, 195 Ariz. 531, 991 P.2d 231 (1999) (upholding the constitutionality of the statutory text); *Taylor v. Graham County Chamber of Commerce*, 201 Ariz. 184, 33 P.3d 518  (Ct. App. 2001) (applying the EPA).  Prior to the adoption of the EPA, employment relationships were governed largely by Arizona common law, which

---

[1]In his deposition, White claims that Dr. Patel kept for himself honoraria and payments received for giving lectures outside the workplace.  However, his assertion was admittedly not based on personal knowledge but rather hearsay, which will not be considered as evidence for purposes of summary judgment. *See* Fed. R. Evid. 802.  White has failed to produce any admissible evidence of his assertion.

presumed that employment relationships were both contractual in nature and terminable at will by either party, but also included several exceptions to the at-will doctrine. *Fallar v. Compuware Corp.*, 202 F. Supp. 2d 1067, 1075 (D. Ariz. 2002). The EPA codifies the at-will presumption and specifies very few situations in which the presumption may be rebutted. *See Taylor*, 201 Ariz. at 192, 33 P.3d at 526.

The EPA also makes clear that a terminated employee may only assert a claim against an employer in limited circumstances. *See Johnson v. Hispanic Broadcasters of Tucson, Inc.*, 196 Ariz. 597, 599, 2 P.3d 687, 689 (Ct. App. 2000) (noting that the legislature's intent in enacting the EPA was to "limit the circumstances in which a terminated employee can sue an employer . . ."). According to A.R.S. § 23-1501(3)(a), one of the few circumstances in which a terminated employee may assert a claim against an employer is if "[t]he employer has terminated the employment relationship of an employee in breach of an employment contract, as set forth in paragraph 2 of this section, in which case the remedies for the breach are limited to the remedies for a breach of contract." As it applies to breach of contract claims, the EPA "changes our inquiry from whether the employment agreement is enforceable at common law to whether the employment agreement satisfies the statutory requirements." *Johnson*, 196 Ariz. at 600, 2 P.3d at 690; *see also* Rita A. Meiser, *DeMasse v. ITT Corporation: A New Legal Landscape for Employee Handbooks?*, 36 ARIZ. ATT'Y 22, 23 (2000) ("[W]here an employment contract exists, and the contract meets the rigid criteria of the statute, a breach of contract claim lies for actions by the employer which violate the contract.").

As such, the EPA not only applies to White's breach of contract claim, but governs it exclusively. As AKDHC points out, White's characterization of his claim as one arising from a breach of certain salary and bonus provisions, and not arising from the termination of his employment, is a transparent attempt to avoid complying with the strict statutory requirements of the EPA. White's characterization also contradicts his Second Amended Complaint, in which he claims that "[w]hen Defendant terminated Dr. White in

the third year of his five (5) year contract, it breached the contract." Therefore, the EPA governs all aspects of White's breach of contract claim.

### 2. White was presumptively an at-will employee under the EPA.

In pertinent part, A.R.S. § 23-1501(2) provides:

> The employment relationship is severable at the pleasure of either the employee or the employer unless both the employee and the employer have signed a written contract to the contrary setting forth that the employment relationship shall remain in effect for a specified duration of time or otherwise expressly restricting the right of either party to terminate the employment relationship. Both the employee and the employer must sign this written contract, or this written contract must be set forth in the employment handbook or manual or any similar document distributed to the employee, if that document expresses the intent that it is a contract of employment, or this written contract must be set forth in a writing signed by the party to be charged . . . .

The general rule, then, is simply that employment relationships in Arizona are presumptively severable by either party at any time, or, in other words, presumptively at will. *Taylor*, 201 Ariz. at 193, 33 P.3d at 527. Taken in conjunction with A.R.S. § 23-1501(3)(a), A.R.S. § 23-1501(2) dictates that to prevail on a breach of contract claim against an employer, an employee must show that the employer breached a contract that meets the requirements of A.R.S. § 23-1501(2).

In this case, it is undisputed that White and AKDHC entered into an employment relationship in the state of Arizona on September 12, 2003, when both parties signed the Employment Agreement. Under the EPA, the employment relationship was presumptively severable at will, allowing either White or AKDHC to terminate the relationship with or without cause, subject only to the requirement of ninety days' notice. Therefore, unless there is a genuine issue of material fact as to whether the at-will presumption was rebutted by a qualifying written contract in this case, summary judgment in favor of AKDHC on the breach of contract claim is warranted.

### 3. White has failed to rebut the at-will presumption.

While the general at-will presumption contained within the first sentence of A.R.S. § 23-1501(2) is relatively easy to understand, courts have recognized that the remainder of the provision, which enumerates the situations in which the presumption may be

- 8 -

rebutted, is less than a "model of clarity." *Taylor*, 201 Ariz. at 193, 33 P.3d at 527. What can be deciphered with relative ease is that a terminated employee wishing to assert a breach of contract claim against an employer must show that both parties entered into a written contract that either (1) states that the employment relationship has a specified duration, or (2) otherwise expressly restricts the right of either party to terminate the employment relationship.

The confusion stems from the fact that while the first sentence requires both parties to sign the written contract, the second sentence provides alternatives to that requirement. Specifically, the second sentence states that a written contract meeting either of the initial two substantive requirements must (1) be signed by both parties, or (2) be signed by the party to be charged, or (3) be included in an employment handbook, manual, or similar document that expresses an intent for it to be an employment contract. Under traditional canons of statutory interpretation, because the second sentence is more specific as to the signing requirement than the first sentence, the second sentence with its three alternatives will govern. *See NLRB v. A-Plus Roofing*, 39 F.3d 1410, 1415 (9th Cir. 1994) ("It is a well-settled canon of statutory interpretation that specific provisions prevail over general provisions."); *Markair, Inc. v. CAB*, 744 F.2d 1383, 1385 (9th Cir. 1984) (noting the "well-settled rule of statutory construction that the specific terms of a statute override the general terms.").

Therefore, to prevail on his breach of contract claim, White bears the burden of showing that there is a written contract that meets one of the two substantive requirements and one of the three formalities outlined in A.R.S. § 23-1501(2). In determining whether an employment contract or other document satisfies these requirements, we "apply common law principles of contract interpretation" and "give effect to the parties' intent." *Johnson*, 196 Ariz. at 599, 2 P.3d at 689.

### a. The Employment Agreement does not rebut the at-will presumption.

Provision 2 of the Employment Agreement states that the term of the agreement "shall continue until terminated as hereinafter provided." Provision 11, entitled "Termination," specifies that the agreement "may be terminated by either party hereto without cause upon ninety (90) days written notice to the other party" and that AKDHC "shall have the right at all time to discharge Employee for cause." No other provision addresses the severability of the employment relationship between White and AKDHC.

Although the Employment Agreement is a written contract signed by both White and AKDHC, it fails to meet the other requirements of A.R.S. § 23-1501(2) because it neither (1) states that the employment relationship has a specified duration, nor (2) otherwise expressly restricts the right of either party to terminate the employment relationship. The ninety-day notice requirement is not an express restriction on AKDHC's right to terminate White's employment, but rather a procedural formality that must be observed if AKDHC chooses to exercise its right to terminate. If anything, the contract language affirms the at-will employment status. Therefore, the Employment Agreement cannot be used as a basis for White's breach of contract claim unless it was modified to meet the requirements of A.R.S. § 23-1501(2). Because no other documents satisfy the requirements of A.R.S. § 23-1501(2), as explained below, the Court need not reach the issue of whether each document modified the Employment Agreement.

### b. The Mortgage Letters do not rebut the at-will presumption.

The three Mortgage Letters outline White's projected salary and bonus structure for the purpose of facilitating his acquisition of a mortgage. Although there is some dispute as to whether the January 2004 letter was authorized, viewed in the light most favorable to White, all three letters were signed by an agent of AKDHC. As such, all three letters meet the formality requirement of A.R.S. § 23-1501(2), because they were all signed by AKDHC, the party to be charged.

The letters do not, however, meet either of the substantive requirements of A.R.S. § 23-1501(2). First, none of the letters states that the employment relationship has a specified duration. White contends that the "guaranteed" salary and bonus projections qualify as a statement that the employment relationship has a specified duration of at least five years. This argument lacks merit because, unlike some states, Arizona does not follow the presumption that guaranteed per-year compensation makes the employment relationship one of a specified duration. *Horizon Corp. v. Weinberg*, 23 Ariz. App. 215, 217, 531 P.2d 1153, 1155 (1975) ("[A] hiring at a specified sum per week, month or year, is, in the absence of special circumstances, no more than an indefinite hiring."). *See also Johnson*, 196 Ariz. at 600, 2 P.3d at 690 (concluding that a contract clause guaranteeing the plaintiff a first year income of $52,000 does not qualify as a commitment for a certain duration under A.R.S. § 23-1501(2)). Second, none of the letters includes language that expressly restricts the right of either White or AKDHC to terminate the employment relationship. Therefore, the Mortgage Letters are an insufficient basis for White's breach of contract claim.

### c. The BOD Resolution does not rebut the at-will presumption.

As mentioned, in the January 2006 BOD Resolution, AKDHC's board changed the partnership requirements from a $42,000 one-time buy-in to a five-year partnership track in which physicians are expected to provide "sweat equity" in exchange for full partnership status at the end of the five-year period. As a preliminary matter, the BOD Resolution meets the formality requirements of A.R.S. § 23-1501(2), because the proposal was unanimously passed by all board members and the minutes were signed by Price, AKDHC's CEO and agent.

However, it fails to meet either of the two substantive requirements. First, it does not state that the employment relationship is one of a specified duration. As explained above, Arizona does not follow the presumption that guaranteed per-year compensation makes the employment relationship one of a specified duration. As to the second requirement, White argues that the BOD Resolution "expressly restricted AKDHC's right

to terminate Dr. White'[s] employment," but fails to indicate which language supports his contention. While the BOD Resolution does address the partnership track and salary/bonus structure, it does not include any language that expressly restricts the right of either AKDHC or its physicians to terminate the employment relationship. The BOD Resolution is entirely consistent with the at-will and ninety-day notice terms of the Employment Agreement. Physicians who have remained at-will employees for five years and are deemed suitable will be made shareholders without the previous $42,000 buy-in. Nothing in the text of the BOD Resolution suggests that the at-will term of the Employment Agreement is repealed and that AKDHC obligates itself to employ for five years (and then admit as a shareholder) anyone whom it thinks not worth the legal battle to discharge for cause. Therefore, the BOD Resolution is not a qualifying contract under the EPA and cannot be used to support White's breach of contract claim.

**d. The Physician Guide does not rebut the at-will presumption.**

The Physician Guide includes AKDHC's policies and practices, and White signed a Statement of Acceptance, acknowledging that he received it. The Physician Guide fails to meet either of the substantive requirements of A.R.S. § 23-1501(2), because there is no language in the Guide stating that the employment relationship has a specified duration and there is no language that otherwise expressly restricts the right of either party to terminate the employment relationship. Therefore, the Physician Guide also fails to rebut the at-will presumption and does not support White's breach of contract claim.

**4. AKDHC is entitled to summary judgment on White's breach of contract claim.**

Because the material facts relevant to White's breach of contract claim are undisputed, and because there are no qualifying contracts that rebut the at-will employment presumption, AKDHC is entitled to summary judgment in its favor on the breach of contract claim.

**B.     Breach of Implied Covenant of Good Faith and Fair Dealing**

The covenant of good faith and fair dealing is implied in every contract, including at-will employment contracts. *See Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 385, 710 P.2d 1025, 1040 (1985), *superseded in part by* A.R.S. § 23-1501. The covenant "requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement." *Id.* at 383, 710 P.2d at 1038. Therefore, it protects an employee only to the extent that the employer denied the terminated employee benefits agreed to in the employment contract. *Id.* at 385, 710 P.2d at 1040.

In the context of a pure at-will employment contract with no agreed-to benefits and no promise of continued employment or tenure, a termination without cause does not breach the implied covenant of good faith and fair dealing. *Id.* at 386, 710 P.2d at 1041; *see also Consumers Int'l v. Sysco Corp.*, 191 Ariz. 32, 37, 951 P.2d 897, 902 (Ct. App. 1997) (reiterating that the *Wagenseller* court rejected the argument that the covenant of good faith and fair dealing prevents a "no cause" termination of an at-will employment relationship). However, a viable claim for breach of the implied covenant may lie if a plaintiff is alleging that conduct other than the termination itself breached the covenant. *See, e.g., Comeaux v. Brown &Williamson Tobacco Co.*, 915 F.2d 1264, 1272 (9th Cir. 1990).

**1.     AKDHC did not breach the implied covenant of good faith and fair dealing by terminating White without cause.**

In this case, as concluded above, White was an at-will employee of AKDHC, because none of the documents alleged by White to have created a five-year employment contract rebutted the at-will presumption. Furthermore, AKDHC chose to terminate White without cause and continued to pay White's full salary, benefits, and a bonus for ninety days after notice was given. In accordance with Arizona law, because White was employed at will and because AKDHC terminated the relationship without cause, the mere act of terminating White's employment did not breach the implied covenant of good

faith and fair dealing.  Therefore, White's claims that the termination itself and

AKDHC's failure to pay White's salary through 2009 are without merit.

**2.  AKDHC did not breach the implied covenant of good faith and fair dealing by refusing to allow White to continue practicing medicine during the ninety-day period after notice of termination.**

Provision 7 of the Employment Agreement states that AKDHC will maintain

facilities and provide equipment, drugs, supplies, and personnel required by White to

perform his duties during his employment.  However, while Provision 11 does require

AKDHC to give a ninety-day notice of termination, it does not expressly require AKDHC

to allow White to continue providing services for AKDHC during the ninety-day period.

In short, once relieved with pay, White had no duties for which he needed equipment,

drugs, supplies, and personnel.

Moreover, White has no identified damages arising from AKDHC's refusal to

allow him to practice during the ninety-day period.  Damages are an essential element of

a claim for breach of the implied covenant of good faith and fair dealing.  *See United*

*Dairymen of Arizona v. Schugg*, 212 Ariz. 133, 139, 128 P.3d 756, 762 (Ct. App. 2006);

*see also Riggs v. Bank of Am., N.A.*, 2009 U.S. Dist. LEXIS 6264, at *8 (D. Ariz. Jan. 29,

2009).  Damages for breach of the implied covenant of good faith and fair dealing are

usually limited to ordinary contract damages.  *United Dairymen of Arizona*, 212 Ariz. at

139, 128 P.3d at 762.  Such damages could not be shown because, absent specific terms

suggesting a different intent, in the usual employment contract the provision of services is

for the benefit of the employer, not the employee.  The employee's expectation is pay and

related benefits.  The employer may forfeit the services to avoid risk of harm to patient

and business relations from the continued presence of a distrusted person.

Therefore, White's second argument that AKDHC breached the covenant by

failing to provide White with continued "facilities, equipment, supplies, personnel, and

access to patient records and files"  during the ninety-day period is unfounded.

**3. AKDHC did not breach the implied covenant of good faith and fair dealing by notifying other hospitals that White was no longer associated with AKDHC.[2]**

On September 18, 2006, the same day it provided White with notice of termination, AKDHC sent a memorandum to a number of hospitals in the area at which White had staffing privileges. The memorandum correctly informed the hospitals that White was no longer associated with AKDHC, effective September 18, 2006. This was no breach of the implied covenant of good faith and fair dealing. The memorandum reveals no ill-will or bad faith. It was necessary to end White's apparent authority to act on behalf of AKDHC. Finally, White offers no evidence of contract damages from this, which is necessary for breach of the implied covenant of good faith and fair dealing. *United Dairymen of Arizona*, 212 Ariz. at 139, 128 P.3d at 762.

**4. AKDHC did not breach the implied covenant of good faith and fair dealing by failing to hold a formal Governance Committee hearing before terminating White's employment.**

As explained above, the covenant of good faith and fair dealing is implied in all contracts and requires each party to avoid hindering the other party's right to receive the benefits of the contract. From the outset, it is unclear from White's argument exactly what underlying contract guarantees to him the right to appear before the Governance Committee before termination. The Employment Agreement does not mention the Governance Committee. The Physician Guide merely defines the purpose of the Governance Committee without conferring on employees a right to a formal Governance Committee hearing under any circumstances.

The September 11, 2006 letter from Price to White states, in apparent reference to various instances of White's alleged misconduct, "The Governance Committee will

---

[2] In his Complaint, White alleged that the memorandum was only evidence of racial discrimination that supported his Title VII and 42 U.S.C. § 1981 claims. In his Response to Defendant's Motion for Summary Judgment, however, White abandoned that argument and instead alleged that the memorandum breached the implied covenant of good faith and fair dealing. Therefore, it is considered under the implied covenant claim.

conduct a peer review investigation, at which time you will have the opportunity to candidly discuss these specific situations in depth." The letter is signed by Price in her official capacity as CEO of AKDHC. White responded with his September 12, 2006 letter, in which he "welcome[d] the opportunity to discuss the details regarding issues of [his] conduct at AKDHC to the Governance Committee."

This exchange of letters did not create a contractual right to appear before the Governance Committee, because there was no consideration. Therefore, the letters did not constitute an enforceable contract or a valid modification of the existing Employment Agreement. As such, they cannot be used as a basis for White's claim of breach of the implied covenant of good faith and fair dealing.

Moreover, the Governance Committee ultimately referred the matter directly to the Board of Directors without a recommendation. The Governance Committee's non-binding promise to hear White ceased to matter when it took itself out of the process, and nothing bound the Board to hear White.

**5. AKDHC is entitled to summary judgment on White's claim of breach of the implied covenant of good faith and fair dealing.**

Because no material facts relevant to the claim of breach of the implied covenant of good faith and fair dealing are disputed, and because AKDHC did not breach the implied covenant of good faith and fair dealing under those facts, summary judgment in favor of AKDHC is warranted on this claim.

**C. Matters Not Relevant to the Breach of Contract and Implied Covenant Claims**

The parties' briefs and statements of facts have labored through many criminations and recriminations. They are not weighed here because the case does not turn on their merits. Under Arizona contract law and the EPA, employers are not required to make best, good, or even sensible decisions when hiring and firing, any more than employees are when signing on and quitting. Absent contract terms, no process is required of either party, and neither is barred from being wrong, careless, unfair, or even foolish. It is enough that the employment relationship no longer pleases one side or the other. The

parties have joined battle on the cause and fault for the distrust and acrimony into which they have descended, but the Court relucts.

## D. Race Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, 42 U.S.C. § 1981(a) guarantees that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." Title VII claims and claims based on 42 U.S.C. § 1981 may be addressed together, because § 1981 claims are analyzed under the same framework as Title VII claims. *See Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

To survive summary judgment on a Title VII claim of racial discrimination, an employee must make a prima facie showing that (1) the employee belonged to a protected class, (2) the employee was qualified for the job, (3) the employee was subjected to an adverse employment action, and (4) similarly situated employees not in the employee's protected class received more favorable treatment. *Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006); *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002). The proof required to establish the prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). If the plaintiff establishes his or her prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant is successful, the burden shifts back to the plaintiff to prove that the defendant's reason was a pretext. *Id; see also Tarin v. County of Los Angeles*, 123 F.3d 1259, 1264 (9th Cir. 1997) (applying the burden-shifting framework in the context of a claim of racial discrimination).

**1. White's prima facie showing of racial discrimination fails for lack of showing that similarly situated employees not in his protected class received more favorable treatment.**

White is African American and therefore belongs to a protected class. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1031 (9th Cir. 2006) (noting that African Americans are a protected class). Though AKDHC contests it, the evidence on summary judgment more than supports the conclusion that White was qualified for his position as a nephrologist. There is no dispute that White was subjected to an adverse employment action, because his employment was terminated. *See Brooks v. City of San Mateo*, 214 F.3d 1082, 1093 (9th Cir. 2000) (noting that termination constitutes an adverse employment action for Title VII purposes). Therefore, White has established the first three elements of his prima facie case.

However, White fails on the fourth element of the prima facie case - that other employees not in his protected class received more favorable treatment and that he was similarly situated to those employees "in all material respects." *Moran*, 447 F.3d at 755. Employees are similarly situated when "they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Furthermore, employees in supervisory positions with more responsibility are not similarly situated to lower-level employees. *Id.*

As to the issue of favorable treatment, viewed in the light most favorable to White, the evidence shows that other physicians at AKDHC, including Drs. Schon, Sandler, Raskin, Bidwell, Guerra, and Patel, were reprimanded and counseled for inappropriate behavior and statements to other workers, but were not terminated. None of these physicians was African American. This suggests that other employees not in White's protected class received more favorable treatment than White in this respect. Indeed, the evidence suggests that the inappropriate behavior and statements to other workers was not a sufficient cause of termination for AKDHC, as they were first brought up on the eve of the termination, long after they occurred.

However, on this record White was not similarly situated to these other employees in all material respects. First, while it is true that at least one physician, Dr. Patel, was a non-shareholder physician at the time he was reprimanded, just as White is a non-shareholder physician, most other physicians who were reprimanded were shareholders. Shareholders are not similarly situated to non-shareholder employees in the same sense that supervisors are not similarly situated to lower level employees. More lenient treatment of shareholder physicians compared to non-shareholder physicians is to be expected.

Second, and more importantly, while White received and kept payments from Ortho Biotech without authorization from AKDHC, no other physician at AKDHC, including Dr. Patel, has kept honoraria and payments for giving lectures without AKDHC's authorization. This difference is objectively material, and it is AKDHC's primary proffered reason for terminating White. Without a basis for comparison, it cannot be said that AKDHC would have interpreted the "Exclusive Service" provision in the Employment Agreement any differently in the case of an employee outside of White's protected class, or would not have terminated such an employee for taking such payments personally. Therefore, White has failed to establish a prima facie case of racial discrimination.

**2. In the alternative, there is no evidence that AKDHC's articulated legitimate nondiscriminatory reason for terminating White was a pretext for race.**

If White had made a prima facie case of race discrimination, the burden would shift to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Wallis*, 26 F.3d at 885. Like the prima facie case, that burden is usually met easily, and AKDHC easily meets it here. Specifically, White took honoraria and payments from Ortho Biotech and others in contravention of AKDHC's alleged "common pot" policy and its interpretation of the Employment Agreement. The minutes of the September 15, 2006 meeting at which the shareholders unanimously voted to

terminate White refer to their concern that White's "intellectual dishonesty will always be in question." The parties dispute whether the "Exclusive Service" provision of the Employment Agreement prohibits White from taking such compensation. It certainly can be read fairly to do so, and it is enough to escape liability that AKDHC enforced its interpretation of its contract without regard to race, even if its interpretation is debatable under contract theory, which the Court need not decide.

If the employer successfully articulates a legitimate, nondiscriminatory reason for terminating the employee, the employee must show that the stated reason was merely a pretext for some other discriminatory motive. *Wallis*, 26 F.3d at 885. To show pretext, the plaintiff can produce direct evidence showing that "the discrimination more likely motivated the employer" or indirect evidence showing that "the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641. Direct evidence consists of clearly racist or discriminatory statements or actions by the employer, and very little direct evidence is required to raise a genuine issue of material fact. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). However, if the plaintiff can only produce indirect, circumstantial evidence, it must be "specific and substantial" to defeat summary judgment. *Id.*

White has failed to produce any direct evidence that racial animus motivated AKDHC's decision to terminate him. He has failed to point to any racial or discriminatory statements or actions by AKDHC. In fact, White did not even argue pretext in his Response to AKDHC's Motion for Summary Judgment. Viewed in the light most favorable to White, while it is true that White is both African American and the only physician employee ever to have been hired or discharged by AKDHC, White has offered no evidence that this is anything more than a coincidence.

White has also failed to produce specific and substantial indirect evidence showing that AKDHC's reason for terminating him lacks credence, especially in light of the "same actor" presumption, to which AKDHC is entitled. "[W]here the same actor is responsible

for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) (applying the presumption where the person who made the decision to terminate the plaintiff was the same person who hired the plaintiff one year earlier). This presumption has been applied even where the adverse employment action did not rise to the level of a termination and where the time difference between the hiring and the adverse employment action was three years. *See Coghlan*, 413 F.3d at 1097; *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000). The inference is based upon the principle that an employer's initial desire to hire an employee is "strong evidence that the employer is not biased against the protected class to which the employee belongs." *Coghlan*, 413 F.3d at 1096. The plaintiff must therefore make an "extraordinarily strong showing of discrimination" to rebut the presumption and avoid summary judgment. *Id.* at 1097.

AKDHC is entitled to the "same actor" inference because almost all of the shareholders who unanimously voted to terminate White were the same shareholders who initially voted unanimously to hire White. Susan Price was among this group of shareholders. All of these shareholders certainly knew that White was African American, because many of them interviewed him before voting to hire him. Nothing here suggests that at least ten shareholders developed a racial bias against African Americans in the three years between White's hiring and termination.

White has failed to rebut the presumption, because he cannot point to anything other than the fact that he is the only African American physician ever to have been hired or fired by AKDHC. As mentioned above, there is no evidence that other non-African American physicians at AKDHC have failed to remit honoraria received for giving lectures outside the workplace. Therefore, there is no basis from which to infer that AKDHC's proffered reason for the termination, namely White's admitted failure to remit honoraria to AKDHC, was a pretext for race, even if the "common pot" remittance policy is unclear and debatable. There is also no basis to conclude that AKDHC would have

treated non-African American physician employees any differently under the circumstances. Because White has failed to raise a genuine issue of material fact as to his racial discrimination claims, AKDHC is entitled to summary judgment on both racial discrimination claims.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (doc. # 68) is granted.

IT IS FURTHER ORDERED that the Clerk of the Court enter judgment in favor of Defendant and that Plaintiff take nothing. The Clerk shall terminate this action.

DATED this 1st day of October, 2009.

_____
Neil V. Wake
United States District Judge